IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| MARK L. KNIGHT, | CIVIL ACTION NO. 9:15-4196-RMG-BM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI)[1] on August 1, 2012, alleging disability beginning June 18, 2012, due to Crohn's disease, prostate cancer (recovering), and high blood pressure. (R.pp. 10, 216, 223, 252). Plaintiff's claims were denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on March 19, 2015. (R.pp. 28-69). The ALJ



---

[1] Although the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot establish that [he] was disabled during the insured period for DIB may still receive SSI benefits if [he] can establish that [he] is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542, 2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005). See also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir. 1999)[Discussing the difference between DIB and SSI benefits].

thereafter denied Plaintiff's claim in a decision issued July 23, 2015. (R.pp. 10-21). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 2-4).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also, Hepp v. Astrue, 511 F.3d 798, 806 (8th cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].



2

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## Medical Records

In May and June 2012, Plaintiff sought treatment from his primary care physician, Dr. George Butler of Pageland Family Medicine, for complaints of low back pain. Dr. Butler noted that Plaintiff had a history of prostate cancer, but that his recent urologic testing was normal. Plaintiff also reported that he had complete pain relief with Lortab. Dr. Butler provided Plaintiff with samples of Cialis; prescribed Lortab, Vimovo, and Flexeral; referred Plaintiff to an orthopedic surgeon; and wrote a note excusing Plaintiff from work for six days. (R.pp. 338, 341).

On June 21, 2016, Plaintiff underwent a colonoscopy and biopsy based on his complaints of perianal pain and pressure with rectal bleeding. Dr. Salim Ghorra noted that Plaintiff had multiple ulcers in his cecum and colon and had proctitis with erythema and edema. Dr. Ghorra assessed that Plaintiff had early Crohn's disease and prescribed Flagyl. (R.pp. 353-354, 362, 414-415).

Plaintiff was seen at Chesterfield General Hospital on June 27, 2012, complaining of severe perianal pain, nausea, and vomiting. He was hospitalized for six days for an exacerbation of Crohn's disease, and was then released in stable condition with prescriptions for Prednisone and Flagyl. (R.pp. 359-368). However, on July 13, 2012, he returned to Chesterfield General Hospital complaining of increased perianal pain and pressure. A CT scan showed bilateral perirectal



abscesses, and Plaintiff underwent an incision and drainage with insertion of Penrose drains. He remained hospitalized for two weeks and was then discharged with prescriptions for prednisone, two antibiotics, and pain medication. (R.pp. 370, 374, 418-419).

On August 1, 2012, Plaintiff complained to Dr. Ghorra of abdominal cramping and pain and of bleeding at his incision site. (R.p. 406). Dr. Ghorra performed incision and drainage of Plaintiff's perirectal abscesses on August 7, 2012, following which Plaintiff remained in the hospital for six days. (R.pp. 403-404, 416-417, 426, 430-431). By August 28, 2012, Dr. Ghorra noted that Plaintiff was doing "quite nicely" and regaining some weight. Plaintiff's wounds had started to granulate with decreased drainage; Dr. Ghorra removed the Penrose drains; and Plaintiff's antibiotic and Prednisone prescriptions were continued. (R.pp. 527-529).

On September 5, 2012, Dr. Ghorra indicated that Plaintiff was doing quite well and was without fever or chills. Plaintiff's drainage had decreased so all of his drains were removed. Plaintiff had two small open wounds (one of which was slightly deep with minimal drainage). Flagyl and Prednisone were prescribed. (R.p. 525). On September 13, 2012, Plaintiff complained of red and yellow tinted drainage, pain and weakness in his legs, and feeling like both liquids and solid foods were getting stuck in his chest. (R.pp. 523-524). Followup care for Plaintiff's prostate cancer on September 21, 2012 with urologist Dr. Theodore Stamatakos revealed normal findings (other than a notation concerning Plaintiff's draining fistulas), including a normal PSA level. (R.pp. 535-538). Thereafter, on September 27, 2012, Dr. Ghorra wrote that Plaintiff was doing quite well and had regained some weight. Plaintiff reported that he was able to walk and sit better. Dr. Ghorra noted that Plaintiff's two wounds were starting to granulate with minimal posterior purulent drainage. Prednisone was prescribed. (R.p. 521).



In October 2012, Plaintiff complained of having up to five bowel movements every morning, perianal and stomach pain, and minimal drainage. (R.p. 520). Even so, on October 18, 2012, Dr. Ghorra noted that Plaintiff had been doing fairly well, had regained some weight, had only nominal drainage, and that his two open wounds were almost completely closed. Flagyl was prescribed. (R.pp. 517-519). Incision and drainage for persistent perianal and perirectal abscesses was performed on October 25, 2012, and Plaintiff was hospitalized for eight days. (R.pp. 441-445). A CT scan on October 30, 2012 revealed interval improvement in Plaintiff's perianal abscesses with a decrease in fluid collection and only a small collection of fluid below his coccyx. (R.p. 476).

Dr. Pravin Patel performed a consultative examination on November 9, 2012. Plaintiff reported to Dr. Patel that he had trouble controlling his bowel movements due to Crohn's disease, that he suffered from low back pain treated with pain medication prescribed by his primary care physician, that he had no current prostate problems related to his prior prostate cancer, and well-controlled hypertension. It was noted that Plaintiff's left second finger had been amputated in 1995 due to a work-related accident. Plaintiff reportedly lived by himself, was generally independent in his activities of daily living, and received some help from his sister. Dr. Patel noted that Plaintiff had recently undergone surgery and appeared to be in pain due to the indwelling tubes over his anal area, which caused him to be uncomfortable sitting. Plaintiff was not able to get up or lay down on the examination table due to his recent surgery, and he did not perform any lumbar and range of motion testing or straight-leg raise tests. However, Plaintiff had full range of motion in his cervical spine, shoulders, elbows, wrists, and knees; he had full strength (5/5) in all of his extremities; no atrophy; normal reflexes; full grip strength; and could perform fine and gross manipulation with both hands. Dr. Patel noted some mild atrophy in Plaintiff's left arm and left thigh, and that Plaintiff had





difficulty walking as a result of pain from his recent surgery. Dr. Patel stated that he believed that Plaintiff "will have problem [sic] walking due to his current surgery. [Plaintiff] is able to listen, see, hear, and reason. He can handle, reach, pull, grasp, and finger. Once he recuperates if at all completely [sic] with his Crohn's disease and anal fistula, he would be able to ambulate." Dr. Patel thought that Plaintiff was clear, coherent, and able to handle his own funds. (R.pp. 458-462).

On November 29, 2012, Plaintiff complained of blood in his bowel movements and of having three to four bowel movements a day. He requested a refill of pain medication (Percocet). (R.p. 506).

In December, 2012, Dr. Dale Von Slooten, a state agency physician, reviewed Plaintiff's medical records and history and opined that Plaintiff was capable of performing medium work[2] with certain visual limitations. (R.pp. 77-79). On December 4, 2012, state agency psychologist Dr. Samuel Goots opined after review of Plaintiff's medical records that Plaintiff did not have a medically determinable mental impairment. (R.pp. 76-77).

On December 13, 2012, Plaintiff complained that the bottom of his stomach hurt and he was having three to five bowel movements in the morning with bright red blood. (R.pp. 504-505). A CT scan showed nearly complete resolution of Plaintiff's perirectal abscess on December 26, 2013. (R.pp. 468-469). On January 3, 2013, Dr. Ghorra incised and drained a small abscess close to Plaintiff's previous perineum abscess, close to the sacral area, and by January 22, 2013, Dr. Ghorra noted that Plaintiff felt better and had decreased drainage. Dr. Ghorra prescribed Prednisone. (R.pp.

---

[2]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

550-551). Dr. Stamatakos noted normal physical urological findings including a normal PSA on January 23, 2013. (R.pp. 539-542)

On February 5, 2013, Plaintiff reported drainage, pain, and pressure; requested refills of Percocet; and asked about scheduling another surgery. (R.pp. 548-549). On February 13, 2013, Dr. Ghorra's assessment was Crohn's proctitis with two perineal fistulas. He wrote that Plaintiff had not responded completely to courses of Flagyl and Prednisone, was uncomfortable but in no acute distress, had required two surgeries to decompress a subcutaneous abscess, and that the next step would be a referral to Dr. James Mann, II to offer Plaintiff Remicade. (R.p. 547). On February 21, 2013, Dr. Mann wrote that Plaintiff had done ok since his initial diagnosis of Crohn's disease eight months previously, but had ongoing symptoms including abdominal pain and bleeding during flareups. Blood work was ordered. (R.pp. 599-601). In March 2013, Dr. Mann noted that Plaintiff's fistula was still draining. Plaintiff was on no medication, and blood tests were normal. Dr. Mann ordered a test for tuberculosis, and recommended that Remicade be started if that testing was negative. (R.pp. 602-604). Tuberculosis testing was noted to be negative on March 20, 2013. (R.p. 605).

On April 23, 2013, a state agency psychologist opined that Plaintiff had no medically determinable mental impairments. (R.p. 105). On April 24, 2013, Dr. Ghorra noted that Plaintiff looked comfortable and had gained a few pounds since his previous visit. Plaintiff's sacral wound had healed quite nicely, but he continued to have some drainage in one fistula despite taking Flagyl and Prednisone. The plan was to start Plaintiff on Remicade. (R.pp. 630-631). On May 1, 2013, state agency physician Dr. James Weston opined that Plaintiff could perform medium work with a visual limitation. (R.pp. 106-108).



On June 4, 2013, Dr. Stamatakos's urological examination was normal except for a finding that Plaintiff had mild anal stenosis and anal tenderness for which Plaintiff was encouraged to follow up with Dr. Ghorra.  (R.pp. 635-638). On June 6, 2013, Dr. Ghorra noted that Plaintiff's proctitis with persistent fistula formation was not responsive to conservative therapy.  Although Remicade treatment had been recommended, Plaintiff stated he could not afford this treatment and did not want it despite attempts to explain to him the benefits of the medication and that it could possibly cure the disease or put the disease in remission.  Dr. Ghorra thought that the only other option was to do a diverting colostomy or less likely a partial colectomy or partial proctectomy. (R.pp. 627-628). Plaintiff subsequently underwent a colostomy for his Crohn's disease on June 11, 2013.  It was noted that Remicade had been recommended, but that Plaintiff did not want to start Remicade due to "cough issues."  Plaintiff was hospitalized for six days.  (R.pp. 612-614).

In follow up visits to Dr. Ghorra in June and July 2013, Plaintiff reported some rectal bleeding, pressure, and drainage, as well as pain around his tail bone.  Muscle exercises were recommended.  (R.pp. 621-626).  In September 2013, Plaintiff reported back pain and continued drainage.  Prednisone and Percocet were prescribed by Dr. Ghorra.  (R.p. 618).

On November 7, 2013, Plaintiff complained to Dr. Ghorra about pain in his buttock area with green drainage.  Dr. Ghorra noted a small opening in Plaintiff's left perianal space, but no colitis.  Prednisone and Vicodin were prescribed. (R.pp. 658-660).  The same day, Dr. Ghorra completed a questionnaire in which he opined that Plaintiff could work for no amount of time during a workday; stand for one hour at a time for a total of four hours in a workday; sit for two hours at one time and a total of two hours in a workday; lift five pounds occasionally and no amount of weight frequently; occasionally bend, stoop, tolerate heat, tolerate cold, and tolerate noise exposure;

8



frequently balance, perform fine manipulation, perform gross manipulation, and raise his arms over his shoulder level; and never work around dangerous equipment, operate a motor vehicle, or tolerate dust, smoke, or fumes. Dr. Ghorra also indicated that Plaintiff needed to elevate his legs during the workday and opined that Plaintiff suffered from severe pain. (R.p. 64).

In January 2014, Plaintiff had some drainage from his right buttock, for which Dr. Ghorra prescribed Oxycodone and Metronidazole. (R.pp. 655-657). In February 2014, Dr. Ghorra prescribed Oxycodone, Metronidazole, and Prednisone to treat Plaintiff's bleeding and drainage. Plaintiff ambulated normally at that time. (R.pp. 652-654, 752-753).

On March 5, 2014, Plaintiff reported pain in his bottom and mucus when he tried to have a bowel movement. Dr. Ghorra noted that Plaintiff had two small skin openings on his right buttock in the perianal space, but no cellulitis. His colostomy was in place with no hernias. Plaintiff ambulated normally and had normal motor strength, normal movement of his extremities, and intact sensation. He reported using marijuana once a day. Prednisone and Flagyl were continued. (R.pp. 649-651). On March 26, 2014, Dr. Ghorra assessed Crohn's colitis and minimal drainage and wrote that Plaintiff was regaining weight and doing well. (R.pp. 647-648).

On April 28, 2014, Dr. Ghorra found that Plaintiff had two small open wounds on his right buttock with some granulation tissue and no cellulitis. Percocet was prescribed. (R.pp. 749-751). Plaintiff's perineum wounds were closing nicely on May 28, 2014, and Metronidazole, Prednisone, and Percocet were prescribed by Dr. Ghorra. (R.pp. 746-748).

In May 2014, Plaintiff was seen for the first time at Sandhills Medical Foundation (Sandhills). At that time he had run out of his prescribed blood pressure medication, and his blood pressure was elevated. It was noted that Plaintiff was very anxious, tearful, and jittery. Blood



pressure medications were prescribed, Lexapro was prescribed for anxiety and depression, and Plaintiff was referred to behavioral health. (R.p. 663). In June 2014, Plaintiff reported to Dr. Ghorra that he was doing okay, but still had mucous with bowel movements. His wound was clean and dry and he had no swelling or tenderness. Oxycodone was prescribed. (R.pp. 744-746). On July 9, 2014, Plaintiff reported bleeding from his rectum at least once a month. Examination revealed bleeding from Plaintiff's rectum, but no blood in his colostomy, and closed wounds. Metronidazole and Percocet were refilled. (R.pp. 741-744).

On August 7, 2014, Plaintiff reported he had had a bad week with bleeding, and requested ten milligram Oxycodone from Dr. Ghorra because it was less expensive than his prescribed dosage. Plaintiff had small openings on his right buttock, but no cellulitis. Prednisone, Metronidazole, and Oxycodone were prescribed. (R.pp. 739-741). On August 13, 2014, Plaintiff reported increased anxiety (due to emotional and health stresses) to nurse practitioner (NP) Kari Joyner at Sandhills. He said he was worried about having no income, issues with his Crohn's disease, social isolation, and losing his girlfriend. He reported he stopped Lexapro because he could not afford something that had not been working, and NP Joyner prescribed Prozac. (R.pp. 711-712). That same day, Ann Lee of Sandhills provided an individual psychotherapy session. Plaintiff complained of difficulty coping with health issues and being out of work. (R.p. 710).

On September 12, 2014 Plaintiff reported to Dr. Ghorra that he had leaking from his rectum, felt like he was "sitting on a cyst," and had no energy, although his abdomen felt better. He had open wounds on his right buttock (with no cellulitis being noted), and Prednisone and Oxycodone were prescribed. (R.pp. 737-739). Plaintiff had a psychotherapy session with Ms. Lee on September 30, 2014, at which he reported ongoing depression and anxiety, isolating himself a

10



good bit, staying on the couch all day a couple of days per week, and difficulty being away from home with the colostomy and having to wear a diaper. Ms. Lee noted that Plaintiff's problems included depression, anxiety/worry, sleep, avoiding social situations, inactivity, obsessive thoughts or ruminating, low energy, self-defeating thinking, and loneliness. She recommended that Plaintiff's treatment include relaxation training, cognitive behavioral therapy, and supportive therapy. (R.pp. 704-705).

On October 26, 2014, Plaintiff underwent an incision and drainage of a moderate-sized skin abscess with purulent drainage of his gluteal cleft. He was discharged the same day with prescriptions for Flagyl, Levaquin, and Norco. (R.pp. 675-677). Plaintiff still had drainage and pain at his appointment with Dr. Ghorra the next day. (R.pp. 733-736). On November 3, 2014, Plaintiff reported that he was doing "some better," but had drainage. It was noted that he ambulated normally, had two small areas in his right buttock that were draining some fluid, and no cellulitis. Oxycodone was prescribed. (R.pp. 731-733).

On November 12, 2014, Plaintiff reported feeling the need to urinate frequently, severe stomach pain, and weakness. Dr. Ghorra thought that Plaintiff appeared thin and tired. (R.pp. 728-730). Plaintiff was admitted the same day to Chesterfield General Hospital for an exacerbation of his Crohn's disease with perianal fistulas. A CT scan revealed no abscesses, but probable colitis changes. Plaintiff improved with IV antibiotic treatment, and he was discharged six days later with Flagyl and Prednisone prescribed. (R.pp. 669-670).

On November 25, 2014, Plaintiff appeared thin and had mild drainage from his fistula, but ambulated normally and reported he was doing pretty good. Dr. Ghorra prescribed Prednisone. (R.pp. 725-728). Ms. Lee provided psychotherapy on December 3, 2014. (R.p. 703). On December



9, 2014, Plaintiff reported he was doing better, and Dr. Ghorra noted that Plaintiff had much less drainage and that his colostomy was working well. (R.pp. 723-725). NP Joyner wrote that Plaintiff's anxiety was controlled on Prozac in December 2014, but that he still had nervousness at times. (R.pp. 696, 699).

In January 2015, Plaintiff had drainage which was markedly improved. Prednisone and Oxycodone were prescribed by Dr. Ghorra. (R.pp. 721-722). Plaintiff reported to NP Joyner that Prozac was effective, but his mood and affect were described as sad on January 14, 2015. (R.pp. 692-694). He underwent psychotherapy with Ms. Lee the same day. Plaintiff reported ongoing depression with Prozac "helping a little", but that he still had some days that he stayed on the couch all day. (R.p. 691). Plaintiff reported a flare-up of his Crohn's disease and some drainage on February 11, 2015, but Dr. Ghorra noted that Plaintiff ambulated normally and was in no acute distress. (R.pp. 718-720).

## Discussion

A review of the record shows that Plaintiff was forty-five years old when he alleges he became disabled, has a sixth grade education, and past relevant work as a logging sawyer and a barker operator. (R.pp. 19-20, 34-35, 216, 223, 249, 253, 296). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months.



After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[3] of Crohn's disease and perianal fistulas (R.p. 12), he nevertheless retained the residual functional capacity (RFC) to perform light work[4] with the limitations that he be allowed to alternate sitting and standing positions at thirty-minute intervals throughout the day without leaving the workstation; can only occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and avoid moderate exposure to vibration and to hazardous machinery and unprotected heights. (R.p. 15). At step four, the ALJ found that Plaintiff could not perform any of his past relevant work with these limitations. (R.p. 19). However, the ALJ obtained testimony from a vocational expert (VE) and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with this RFC, and was therefore not entitled to disability benefits. (R.pp. 20-21).

Plaintiff asserts that in reaching this decision, the ALJ erred in making his credibility analysis, and failed to properly consider his combination of impairments in assessing his RFC. After careful review and consideration of the evidence and arguments presented, the undersigned is constrained to agree with the Plaintiff that the ALJ failed to properly evaluate Plaintiff's combination of impairments in assessing Plaintiff's RFC, therefore requiring a remand for further consideration of his claim.

---

[3] An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).



RFC is defined as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). In SSR 96-8p, RFC is defined as a function-by-function assessment of an individual's physical and mental capacities to do sustained, work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours per day, five days per week, or the equivalent. SSR 96-8p, 1996 WL 374184. An RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations);" Id. at *7; and "[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013).

The Commissioner contends that the ALJ reasonably considered the combination of Plaintiff's mental and physical impairments in formulating the RFC assessment. In support of this argument, the Commissioner cites to the ALJ's step two analysis in which he found that Plaintiff's mental impairments were not severe (R.pp. 13-14), and his step three analysis in which he found that Plaintiff "did not have an impairment or combination of impairments" that met or equaled any listing[5] impairment (R.p. 14). Additionally, the Commissioner argues that the evidence does not support a finding that Plaintiff's mental impairments, either singularly or in combination with his physical impairments, caused additional functional limitations beyond those included in the RFC assessment,

---

[5]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medial signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). A claimant is presumed to be disabled if their impairment meets the criteria of an impairment set forth in the Listings. See 20 C.F.R. §§ 416.925, 416.926 (2003).



nor does Plaintiff point to any resulting functional limitations that were not accounted for in the RFC assessment.

However, the undersigned is unable to determine from a plain reading of the decision whether the ALJ properly considered Plaintiff's combination of impairments, and in particular his mental impairments, even though determined to be non-severe, in determining Plaintiff's RFC. Cf. Rivera v. Astrue, No. 12-1095, 2013 WL 4507081, at * 7 (D.Md. Aug. 27, 2013) ["[I]f a claimant [has] a severe impairment or combination of impairments, the ALJ must consider the effects of both the severe and non-severe impairments at the subsequent steps of the process, including the determination of RFC"]; Batzgarcia v. Colvin, No. 16-66, 2016 WL 6900797, at * 3 (W.D.N.C. Nov. 27, 2016) [same]; see also 20 C.F.R. § § 404.1520(e), 404.1523; 404.1545(a)(2); SSR 96-8p, 1996 WL 374184, * 5 (1996); SSR 86-8, 1986 WL 68636, * 5 (1986). At step two, the ALJ found that because Plaintiff's mental impairments of depression and anxiety caused no more than mild limitations in any of the three functional areas of activities of daily living, social functioning, and concentration, persistence, or pace; they were non-severe impairments. (R.pp. 13-14).[6] In doing so, the ALJ stated that when Plaintiff first reported increased anxiety in May 2014, he denied suicidal ideations and was prescribed Lexapro, and that Plaintiff's "treatment records indicated only mild symptoms, conservative therapy session, and no evidence of impatient mental health hospitalization or decompensation. The anxiety and depressive symptoms were generally situational and involved the claimant's medical health and adapting to changes." (R.p. 13). This was essentially the sum total

---

[6]The ALJ specifically determined that Plaintiff's mental impairment resulted in no limitations in his activities of daily living and social functioning, but that he had a mild limitation with respect to his ability to maintain concentration, persistence or pace. (R.p. 14).



of the ALJ's discussion of the evidence relating to Plaintiff's treatment for his anxiety and depression.

The ALJ then stated that "the following [RFC] assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis;" (R.p. 14); which would presumably have included Plaintiff's mild limitation in his concentration, persistence or pace. However, the ALJ's RFC assessment only discusses limitations relating to Plaintiff's *physical* impairments. (R.pp. 15). He does not set forth any limitations that relate to a mental impairment, nor does he (as an alternative) find that Plaintiff has *no* RFC limitations relating to a mental impairment. Additionally, the ALJ included a section in his decision titled "RESIDUAL FUNCTIONAL CAPACITY ANALYSIS" which recites Plaintiff's medical history only as to his physical impairments (primarily as to Plaintiff's Crohn's disease). (R.pp. 16-17). Then, in the "SUMMARY" section of the decision, the ALJ states:

> In sum, the above [RFC] assessment is supported by the overall evidence of record. The restriction to work at the light level considered the combination of the claimant's above impairments, including the ongoing rectal pain. Similarly, the limitation on postural movements and exposure to vibration avoids exacerbations of pain. In deference to the ongoing use of narcotic pain medications, exposure to workplace hazards was also limited. Overall, the [RFC] adequately accounts for the only occasional Crohn's flares and the pain associated with the ongoing rectal problems. Notably, the claimant's bowel disease consistently responded well to treatment with steroids and antibiotics, and the pain was managed well with conservative dosages of pain medications.

R.p. 19. No discussion or even mention of any mental limitations is made, even though the ALJ had earlier specifically stated that the RFC assessment reflected the degree of limitation found in the paragraph B mental function analysis, which included a finding that Plaintiff had a mild limitation



with respect to concentration, persistence or pace. (R.p. 14).⁷ The ALJ's hypothetical to the VE similarly includes only a discussion of limitations relating to Plaintiff's physical impairments. (R.pp. 61-62).

In Mascio, the Fourth Circuit held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work'".⁸ Mascio, 780 F.3d at 638, quoting Winschel v Comm'r of Soc. Sec., 631 F.3d at 1176, 1180 (11th Cir. 2011); see also Straughn v. Colvin, No. 14-200, 2015 WL 4414275, at *4 n.5 (M.D.N.C. July 20, 2015) [reasoning that the ALJ "did not address how the RFC's limitation to 'simple, routine' tasks addressed his finding of 'mild limitations with concentration, persistence or pace.' Thus, the ALJ's decision may also run afoul of the recent decision in Mascio"] (citation and quotation omitted); Salmon v. Colvin, No. 12-1209, 2015 WL 1526020, at *3 (M.D.N.C. Apr. 2, 2015) [noting that "the Fourth Circuit made clear that an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine, tasks or unskilled work."] (citations and quotations omitted). Of course, it may be that the ALJ concluded that Plaintiff had no RFC limitations relating to his mental impairment, but if so, it was incumbent on him to say so. See Mascio, 780 F.3d at 638 [noting that the ALJ may be able to explain why a moderate concentration, persistence, or pace limitation did not

---

⁷"[T]he limitations identified in the 'paragraph B' .... are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96–8p. Instead, "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C." Id.

⁸The ALJ's RFC finding and hypothetical to the VE did not include any of these restrictions. However, the jobs identified by the VE as being jobs that the Plaintiff could perform were all unskilled. (R.pp. 20, 62).

17



translate into a limitation in the RFC ("[f]or example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the [VE]"), but finding that remand was appropriate because the ALJ gave no explanation]; see also Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001) [Court cannot affirm a decision on a ground that the ALJ did not himself invoke in making the decision]. He did not. To the contrary, the ALJ affirmatively states that he had assigned Plaintiff an RFC that accounted for the degree of mental limitation found (which presumably includes Plaintiff's mild limitation with respect to concentration, persistence or pace). (R.p. 14). But then, as noted, he does not address or even discuss this issue in the RFC itself.

As such, it does not appear that the ALJ properly considered the combined cumulative effect of Plaitniff's limitations and whether, together, the limitations rendered Plaintiff disabled. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)[holding ALJ must "adequately explain his or her evaluation of the combined effect of the impairments"]; Hines v. Bowen, 872 F.2d 56 (4th Cir. 1989); Good v. Colvin, No. 1:12–3380–RMG, 2014 WL 358425, at *3 (D.S.C. Jan. 31, 2014). Nor does the ALJ's hypothetical to the VE address this issue. (R.pp. 61-62). Cf. Mascio, 780 F.3d at 638 [commenting that "[n]otably, the hypothetical [to the VE] said nothing about [Plaintiff's] mental limitations"]; see also Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989) [In order for a vocational expert's opinion to be helpful and relevant, it must be "in response to proper hypothetical questions which thoroughly set out all of claimant's impairments"]; Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991) [hypothetical question submitted to the VE must state the claimant's impairments with precision]. Even though the ALJ determined that Plaintiff's mental impairments were not severe impairments, the ALJ must "consider the limiting effects of all [the claimant's] impairment(s),



even those that are not severe," in determining the claimant's RFC. 20 C.F.R. § 404.1545(e); see also SSR 96–8p ["In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"].

Therefore, this action should be remanded for the ALJ to determine Plaintiff's RFC in light of all the evidence and applicable law.  With respect to the remainder of Plaintiff's claims of error, the ALJ will be able to reconsider and re-evaluate the evidence in toto as part of the reconsideration of this claim. Hancock v. Barnhart, 206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted *de novo*].

## Conclusion

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for reevaluation of the evidence as set forth hereinabove, and for such further administrative action as may be necessary.  See Shalala v. Schaefer, 509 U.S. 292 (1993).

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

November 30, 2016
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

>    Robin L. Blume, Clerk
>    United States District Court
>    Post Office Box 835
>    Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

